**Case No. 18-3378**

---

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

◆

**JOSEPH R. HARDESTY**

Plaintiff – Appellant,

v.

**THE KROGER COMPANY, ET AL.**

Defendant – Appellee.

◆

Appeal from the Final Judgment of The United States District Court
For the Southern District of Ohio, Western Division
Case No. 1:16-CV-00367

---

---

**BRIEF OF PLAINTIFF-APPELLANT**

---

---

/s/ Joshua M. Smith
Peter A. Saba (0055535)
Joshua M. Smith (0092360)
Sharon J. Sobers (0030428)
Jeffrey M. Nye (0082247)
STAGNARO, SABA & PATTERSON CO., L.P.A.
2623 Erie Avenue, Cincinnati, Ohio 45208
(513) 533-6715
(513) 533-2716
jms@sspfirm.com
**Attorneys for Plaintiff-Appellant**

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to 6th Cir. R. 26.1, Plaintiff-Appellant Joseph R. Hardesty ("Plaintiff") makes the following disclosures:

1. Are said parties a subsidiary or affiliate of a publicly owned corporation? **No**

2. Is there a publicly owned corporation, not a party to the appeal that has a financial interest in the outcome? **No.**

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ...................................................... i

TABLE OF CONTENTS ...................................................................................... ii

TABLE OF AUTHORITIES ............................................................................... iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...................................... 1

JURISDICTIONAL STATEMENT ..................................................................... 2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ................................. 4

STATEMENT OF THE CASE AND FACTS ...................................................... 6

SUMMARY OF ARGUMENT ..........................................................................25

ARGUMENT......................................................................................................30

    A. Standard of Review....................................................................................30

    B. The "honest belief" rule requires (1) that an employer subjectively holds an honest belief in an articulated non-discriminatory reason for termination, and (2) that the belief be formed in objectively reasonable reliance on particularized facts known at the time the decision was made...30

    C. The decisionmaker did not subjectively honestly believe that Mr. Hardesty declined an incoming call. .........................................................34

    D. Regardless of what the decisionmaker subjectively believed, the decision was not objectively reasonably informed and considered. ..........................45

    E. Whatever belief the decisionmaker held, the alleged conduct is insufficient to warrant termination. ...........................................................49

CONCLUSION ..................................................................................................55

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)(B) .........................55

ADDENDUM #1 ................................................................................................56

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ...............................30

*Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579 (6th Cir. 2002) ..................49

*Clay v. UPS*, 501 F.3d 695 (6th Cir. 2007).................................................31, 36

*Collins v. United States Playing Card Co.*, 466 F. Supp.2d 954 (S.D. Ohio 2006) ...................................................................................................49, 50

*DeBoer v. Musashi Auto Parts, Inc.*, 124 F.App'x 387 (6th Cir. 2005) ...........50

*Eastman Kodak Co. v. Image Technical Services, Inc*., 504 U.S. 451 (1992) ...30

*Foster v. Spring Meadows Health Care Ctr., LLC*, 2013 U.S. Dist. LEXIS 31900 at \*34 (M.D. Tenn. no 3:11 C 01216, March 6, 2013).........................47

*Jones v. Potter*, 488 F.3d 397 (6th Cir.2007).....................................................50

*Manzer v. Shamrock Chemicals Co.*, 29 F.3d 1078 (6th Cir. 1994).................50

*Marshall v. Rawlings Co.*, 854 F. 3d 368 (6th Cir. 2017) .................................31

*Martin v. Toledo Cardiology*, 548 F.3d 405 (6th Cir. 2008).............................46

*McNeely v. Kroger*, 2014 U.S. Dist. LEXIS 97262 at \*42 (E.D. Mich. no. 12-12608, May 9 2014)..........................................................................................47

*Reeves v. Sanderson Plumbing Products*, 530 U.S. 133 (2000).......................36

*Russell v. University of Toledo*, 537 F.3d 596 (6th Cir 2008) ...........................50

*Skalka v. Fernald Environmental Restoration Mgmt. Corp.*, 178 F.3d 414 (6th Cir. 1999)............................................................................................................50

*Smith v. Chrysler Corp.,* 155 F.3d 799 (6th Cir. 1998)....................6, 24, 32, 33

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) .................................41, 50

*Tingle v. Arbors at Hilliard*, 692 F.3d 523 (6th Cir. 2012)..............................32

*Tisdale v. Fed. Express Corp.*, 415 F.3d 516 (6th Cir.2005) ............................51

*Tuttle v. Metro. Gov't,* 474 F.3d 307, 2007 U.S. App. LEXIS 1006, \*30-31, (6th Cir 2007)..............................................................................................................51

*US v. Norman*, 87 F. Supp. 3d 737 (E.D. Penn. 2015).......................................41

*Wexler v. White's Fine Furniture*, 317 F.3d 564 (6th Cir. 2003) ................50, 54

*Williams v. Ford Motor Co.*, 187 F.3d 533 (6th Cir. 1999) ............................30

**Statutes**

28 U.S.C. 1291 .......................................................................... 3

28 U.S.C. 1294(1).......................................................................... 3

28 U.S.C. 1367 .......................................................................... 2

29 U.S.C. 623, et seq.......................................................................2, 23

42 U.S.C. 2000e, et seq. (as amended) ........................................2, 23

**Other Authorities**

*Star Trek: The Next Generation, The First Duty* (syndicated television broadcast Mar. 30, 1992) .................................................................41

**Rules**

Evid.R. 404(b)(2) ...........................................................................36

Evid.R. 801(d)(1)(A) .......................................................................36

*Sixth Circuit Pattern Jury Instructions* at § 1.07 (Credibility of Witnesses), *available at* https://perma.cc/TTW7-Y35Q .......................................................37

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Plaintiff Hardesty submits that oral argument would assist the Court in resolving the issues presented in this appeal, including the district court's incorrect application of the honest belief rule in employment discrimination cases and its additional finding that no evidence existed to demonstrate that the proffered reason was "insufficient to motivate" Plaintiff's termination. For these reasons, Plaintiff requests oral argument.

# JURISDICTIONAL STATEMENT

The district court exercised federal-question subject-matter jurisdiction over this case because the original complaint (R. 1, PAGEID # 6) raised a wrongful termination claim under the Age Discrimination in Employment Act, 29 U.S.C. 623, et seq. The plaintiff subsequently amended his complaint and added, within 90 days of his receipt of a right-to-sue notice from the EEOC, reverse discrimination claims under Title VII of the Civil Rights Act of 1967, 42 U.S.C. 2000e, et seq. (as amended). R. 14, PAGEID # 55-57 (First Amended Complaint). Both complaints also raised related state-law claims over which the district court exercised supplemental jurisdiction under 28 U.S.C. 1367.

The district court granted summary judgment to all defendants on all claims by an order dated March 21, 2018. R. 67, PAGEID # 3854-3876 (Summary Judgment Decision). The plaintiff-appellant filed a timely notice of appeal on April 20, 2018. *See* R. 69 PAGEID # 4223-4224 (Notice of Appeal). That notice of appeal was inadvertently filed under the wrong event within the court's CM/ECF system, and so, in an abundance of caution, the plaintiff-appellant moved for an extension of time to file a new notice of appeal under App. R. 4(a)(5). *See* R. 72, PAGEID # 4227-4229 (Motion for Extension of Time). By an unnumbered notation order entered on May 3, 2018, the district court granted that motion and

ordered that the new notice of appeal, R. 70, PAGEID # 4225-4226, was "accepted as timely." *See* Unnumbered Notation Order, May 3, 2018, at Appx. 1.

This Court has subject matter jurisdiction under 28 U.S.C. 1291 and 28 U.S.C. 1294(1), because the appeal was taken from a final judgment of the Southern District of Ohio.

## <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

1. Whether the district court erred by finding that the employer's decisionmaker subjectively held an honest belief in the proffered nondiscriminatory reason for termination despite record evidence showing that:

   (a) the decisionmaker lied to the management team about the evidence supporting the termination;

   (b) the decisionmaker concealed both the existence of and the content of exculpatory evidence from the management team;

   (c) the decisionmaker relied on and presented to the management team data that she knew was irrelevant to the proffered nondiscriminatory reason for termination; and

   (d) the decisionmaker herself did not subjectively believe the proffered nondiscriminatory reason for termination at the time of termination.

2. Whether the district court erred by finding that the employer's proffered nondiscriminatory reason for termination was objectively reasonably informed and considered despite record evidence showing:

   (a) all of the above-described facts, plus

   (b) that the decisionmaker purposely did not consider the exculpatory evidence when making the decision to terminate the employee.

3. Whether the district court erred in finding that the alleged conduct was sufficient to warrant termination despite record evidence that:

   (a) the employer had a progressive disciplinary policy, not a zero-tolerance policy;

   (b) the employee had an exemplary record and had never been disciplined in the past; and

   (c) other similarly situated employees outside the protected class were either lightly disciplined or not disciplined, rather than terminated, for similar alleged violations.

## STATEMENT OF THE CASE AND FACTS

### A.    Introduction

This case involves the "honest belief" defense to an employment discrimination claim. When an employee satisfies its burdens under the *McDonnell Douglas* test in cases of disparate treatment, an employer has one last opportunity to avoid liability by demonstrating it had an "honest belief" in the proffered nondiscriminatory reason for its employment decision. But in order for this belief to be *honest*, it must be subjectively held by the decisionmaker, and it must be made in reasonable reliance on particularized facts that the employer knew at the time the decision was made. As this Court has put it, the employer must make a "reasonably informed and considered decision before taking the adverse employment action." *Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir. 1998).

Here, Plaintiff-Appellant Joseph Hardesty claims that he was wrongfully terminated from his job at a Kroger recruiting call center because of his age, sex, and race, and that the reason given for his termination—that he allegedly declined an inbound phone call—was a pretext for discrimination in that it had no basis in fact. His employer countered that regardless of whether or not Mr. Hardesty actually declined the call, his termination was not unlawful because the decisionmaker *honestly believed* that he did decline the call. The district court agreed and granted summary judgment to the defendants.

The problem with this decision is that, in granting summary judgment, the district court weighed conflicting evidence regarding (1) what the decisionmaker subjectively believed (i.e., whether her belief was "honestly held"), and (2) whether that decision was objectively "reasonably informed and considered." As to the first point, the district court discounted or disregarded record evidence showing that the decisionmaker lied about the evidence she knew at the time of the decision, that she relied on evidence that she knew was irrelevant to the stated reason for termination, and that she actually did not even subjectively believe the stated reason for termination at the time the termination was made. As to the second point, the district court discounted or disregarded not only evidence that the decisionmaker lied, but also evidence that the decisionmaker refused to consider, for no articulable reason, the exculpatory statement of an eyewitness (among other evidence).

Lying about the justification for an employment decision is evidence from which a jury could conclude that the proffered reason was pretextual, and a belief in a proffered reason for termination cannot be honestly held if it was not held at the time of termination at all. And, a decision cannot be reasonably informed and considered, nor can it be objectively reasonable, if it is based on not only the disregard of an eyewitness statement, but also the *concealment* of such a statement, as well as fabricated evidence.

7

More to the point for purposes of this appeal, the district court improperly invaded the province of the jury by resolving these factual disputes on summary judgment. Put differently: maybe the decisionmaker had a subjectively held and objectively reasonable honest belief that Mr. Hardesty declined a call, or maybe not—but where the record contains evidence supporting each conclusion, that question can't be resolved on summary judgment. The district court's summary judgment decision should be reversed, and this case should be remanded for trial.

**B.    Facts**

Mr. Hardesty worked as a recruiter on the "mass hire team" at Kroger's Center of Recruiting Excellence (or "CoRE") in Blue Ash, Ohio. R. 25 PAGEID # 211 (Hardesty Dep. 27:5-8). CoRE is a call center that employs approximately 200 Kroger employees, with roughly 120 or more being labeled as "recruiters" R. 50, PAGEID # 1888-1889 (30(b)(6) Dep. of Rana Schiff, 20:21-21:5). Recruiters "assess and screen applications, conduct phone screens, prepare interview packages, and present stores with a qualified slate of applicants." R. 45-1, PAGEID # 1309 (Recruiter position profile at 1).

Daniele Williams, an African American woman, was the team manager of CoRE's mass hire team, and Mr. Hardesty's second level supervisor. R. 30 PAGEID # 529 (Williams Dep. 7:1-7) During Ms. Williams' tenure as the mass hire team manager, the team was largely dominated by younger, non-Caucasian,

female employees. R. 47-1, PAGEID # 1393-1395 (Kroger's response to interrogatory no. 7 at 1-3)

Throughout Mr. Hardesty's employment, he met all expectations on the Mass Hire Team. R. 30, PAGEID # 577 (Williams Dep. 160:6-10); R. 49, PAGEID # 1734 (Strosnider Dep. 115:12-19). In Mr. Hardesty's only performance review, he was told he was "doing fine," and that his employer was "impressed that Smith's had requested [him] to assist with their hiring campaign." R. 25, PAGEID # 214 (Hardesty Dep. 39:8-16). There were no prior disciplinary actions against Mr. Hardesty prior to his termination on September 14, 2015. R. 49, PAGEID # 1735-1736 (Strosnider Dep. 116:23-117:14).

On September 10, 2015, Briana Whitlow, a younger African American woman who was a co-worker of Mr. Hardesty's, went to the office of the mass hire team manager, Ms. Williams, and reported seeing Mr. Hardesty decline an inbound call while he was conversing with another Recruiter, Aretha O'Aku. R. 29, PAGEID # 517 (Whitlow Dep. 108:1-109:7). Per Ms. Whitlow, "declining an inbound call" means that a call is incoming to Kroger's phone system, a light flashes on a Recruiter's phone, and the Recruiter pushes a button to decline the call. R. 29, PAGEID # 514 (Whitlow Dep. 97:19-98:6). Ms. Whitlow testified that she recalled Mr. Hardesty do this "one time," though in her statement she claims to

have witnessed Mr. Hardesty "releasing calls" (plural). R. 29, PAGEID # 515

(Whitlow Dep. 101:19-23).

Following Ms. Whitlow's conversation with Ms. Williams, Ms. Whitlow

sent an email to Ms. Williams, alleging what she saw:

> As I was speaking with Carly about scheduling a candidate, I noticed
> Joe was releasing calls (hanging up on candidates) that were coming
> through to his phone while he was in mid conversation with Aretha. I
> just wanted to inform you. This was roughly between 3:15pm and
> 3:30pm today. Thanks!

R. 45-11, PAGEID # 1359 (Whitlow email to Williams, Sept. 10, 2015, at 1).[1]

Following this discussion, Ms. Williams alleges she spoke with Chris

Weiler, a Kroger project manager who worked with the phone systems, to

determine whether they could review an individual phone line to determine if a call

was declined or disconnected. R. 48, PAGEID # 1541-1542 (Weiler Dep. 14:18-

15:2); R. 30, PAGEID # 597 (Williams Dep. 239:16-240:2; 240:19-24). Mr.

Weiler indicated that he did not believe he could provide such details, but that he

would follow up with Ms. Williams the following day. R. 30, PAGEID # 597

(Williams Dep. 240:12-18); R. 48, PAGEID # 1559 (Weiler Dep. 32:13-23).

---

[1] While Ms. Whitlow states in this e-mail that this action is "hanging up on candidates," her testimony makes clear that this is really an act of "declining" a call (i.e., not taking an incoming call). R. 29, PAGEID # 514-515 (Whitlow Dep. 97:19-98:6). This is also confirmed by Ms. Williams' testimony as to what was explained to her by Ms. Whitlow R.30, PAGEID # 545 (Williams Dep. 231:14-232:10).

The following day, Ms. Williams again spoke with Mr. Weiler, who confirmed that the phone system did not have the capability to pull up specific incoming calls and times to see the frequency. R. 48, PAGEID # 1559 (Weiler dep. 32:11-21); *see also* R. 45-10, PAGEID # 1357 (Joe Hardesty – Recap of events at 1). Mr. Weiler was only able to provide Ms. Williams "average call times" for Mr. Hardesty, the Mass Hire Team, and the overall CoRE team. He did so for September 10, 2015 (the date in question), September 3-10, 2015, August 27, 2015-September 3, 2015, and for the prior two weeks. R. 39, PAGEID # 812-819 (call-length reports).

This data only showed that Mr. Hardesty had purportedly shorter average call times on one particular week, and in no way showed that he had released an inbound call. R. 30, PAGEID # 598 (Williams Dep. 244:19-21). Indeed, both Ms. Williams and Mr. Weiler conceded at their respective depositions that shorter call times in no way mean a recruiter is releasing inbound calls or that there is a problem at all. R. 30, PAGEID # 598 (Williams Dep. 244:22-245:9); R. 48, PAGEID # 1601 (Weiler Dep. 74:7-16). Ms. Williams and Mr. Weiler each provided other reasonable explanations for shorter call times, including that a recruiter may simply not talk on the phone as long as others, that a candidate ends a call early, or that a recruiter is not receiving good candidates. R. 30 PAGEID # 598 (Williams Dep. at 244:22-245:9); R. 48, PAGEID # 1572 (Weiler Dep. 45:7-

22). Courtney Strosnider (Mr. Hardesty's immediate supervisor) provided similar explanations, including that a candidate may hang up on the call, *see* R. 49, PAGEID # 1791 (Strosnider Dep. 172:20-25), that applicants may call in with inquiries regarding their application, *see* R. 49, PAGEID # 1798 (Strosnider dep. at 179:9-25), or that a recruiter may transfer a call to another recruiter (e.g., a pharmacy recruiter). *See* R. 49, PAGEID # 1792-1793 (*Id.* at 173:16-174:2). Further, there were prior instances of calls being dropped due to technological issues, which were reported to Ms. Williams and to Ms. Strosnider. *See* R. 49, PAGEID # 1755-1756 (Strosnider Dep. 135:16-136:6).

Following Ms. Williams' discussion with Mr. Weiler, Ms. Williams next spoke with Rana Schiff, the CoRE Operations Manager at the time. R. 45-10, PAGEID # 1357-1358 (Joe Hardesty – Recap of events at 1). The two discussed bringing CoRE's human resources "partner," Diana Victoriano, in on the issue. *Id.*; R. 30 PAGE ID # 597 (Williams Dep. 241:25-242:8).

Ms. Williams next called Mr. Hardesty into her office. R. 30, PAGEID # 599 (Williams Dep. 246:4-10). In doing so, Ms. Williams indicated to Mr. Hardesty that she was looking at "metrics," that his call times were shorter than others, and asked if Mr. Hardesty knew why. R. 25, PAGEID # 222 (Hardesty Dep. 70:4-71:4). Ms. Williams did not give Mr. Hardesty any indication that there

12

had been an allegation that he had released a call, or why she was looking at his average call times. R. 30, PAGEID # 599 (Williams Dep. 247:25-249:6)

Mr. Hardesty responded, explaining that he often speaks quickly on the phone and that there have been situations where he had dropped calls,[2] which were previously brought to Ms. Williams' attention. R. 25, PAGEID # 222 (Hardesty Dep. 70:4-71:4). Plaintiff also offered to perform a mock phone screen with Ms. Williams to verify his call screening process. R. 30, PAGEID # 599 (Williams Dep. 247:8-24). Ms. Williams declined, however, simply stating that she "didn't feel like I needed to." *Id*. Mr. Hardesty also asked if there was an issue, to which Ms. Williams stated no, and that she was simply looking at data. R. 30, PAGEID # 599 (Williams Dep. 248:14-2496). Ms. Williams ended the conversation without ever informing Mr. Hardesty as to the accusation or showing him the phone data indicating his shorter average call times. *Id*.

That same day, Ms. Williams also interviewed Aretha O'Aku, the recruiter with whom Ms. Whitlow claimed Mr. Hardesty was in a conversation when he was allegedly declined an incoming call. R. 30, PAGEID # 597 (Williams Dep. 238:15-21). In the interview, Ms. Williams asked Ms. O'Aku if she remembered speaking with Mr. Hardesty. *Id*. at 238:22-239:1. Ms. O'Aku confirmed that she recalled

---

[2] To be clear, this is in reference to calls dropped due to technological failures that were no fault of Mr. Hardesty. Mr. Hardesty had previously reported these problems to Ms. Williams and Ms. Strosnider.

speaking with Mr. Hardesty that day. *Id*. Next, Ms. Williams asked if Ms. O'Aku noticed anything out of the ordinary in her conversation with Mr. Hardesty. *Id.* Ms. O'Aku confirmed that she did not notice anything out of the ordinary during her conversation with Mr. Hardesty. *Id.* Finally, Ms. Williams asked if Ms. O'Aku had noticed Mr. Hardesty disconnect a call. *Id.* Ms. O'Aku confirmed that *she did not see Mr. Hardesty disconnect a call*. *Id.*

Despite interviewing Ms. O'Aku and hearing her direct contradiction of Ms. Whitlow's accusation, Ms. Williams concealed this interview from her entire investigation. In fact, Ms. Williams drafted a "recap of events" document as her investigation progressed. R. 30, PAGEID # 602-603 (Williams Dep. 261:23-262:23); R. 45-10, PAGEID # 1357-1358 (Joe Hardesty – Recap of events). In the document, she included her conversation with Ms. Whitlow, her discussions with Mr. Weiler, her discussions with Ms. Schiff, the data she reviewed, her discussions with Mr. Hardesty, and her email conversation with Ms. Victoriano. *Id.* The only substantial item omitted from this document was her interview with Ms. O'Aku and the statements Ms. O'Aku made contradicting Ms. Whitlow's accusation. *Id.*

Beyond concealing Ms. O'Aku's account from her "recap of events," Ms. Williams also concealed both the fact of and the content of the interview from all other members of CoRE's management, including Ms. Victoriano (the HR manager), Mr. Moffett (the CoRE General Manager), and Ms. Schiff (the CoRE

Operations Manager). R. 28, PAGEID # 443 (Victoriano Dep. 48:13-23); R. 51, PAGEID # 2209-2212 (Schiff Dep. Part II, 62:25-63:4; 64:11-65:9); R. 27, PAGEID # 403 (Moffett Dep. 171:2-14). Indeed, even though each of these managers confirmed that Ms. Williams discussed the accusation with them, each also testified that they were not aware whether anyone—including Ms. Williams—had spoken with Ms. O'Aku during the investigation. *Id.*

When asked whether Ms. O'Aku's statement factored into her decision to terminate, Ms. Williams strangely—but candidly—admitted in her testimony that it did not. R. 31, PAGEID # 618 (Williams dep. 315:14-23).

Following Ms. Williams's interviews with Mr. Hardesty and Ms. O'Aku, at 3:28 p.m. that day Ms. Williams emailed Ms. Victoriano (her HR partner). R. 30 PAGEID # 600 (Williams Dep. 250:6-253:22). In doing so, she stated:

> Hello Diana,
>
> I have yet another situation ☺. I was informed by one of my recruiters on Thursday that another recruiter was hanging up on applicants calling in. I was told this happened at least 3 times. In looking at the data, there are definite outliers with this recruiter where the average talk time for the mass hire team is 5 minutes. The data has been consistent for the last 2 weeks. In pulling data that reflects the entire CoRE team, again his avg talk time for the last 2 weeks was a min less than the next shortest time.
>
> There is no tolerance for our recruiters to hang up on customers. I do have a statement from the person that witnessed this action and reported it to me. In talking with Rana, we would like to get your insight on addressing this issue but I believe a termination should occur.

15

Looking forward to hearing/reading your advice.

R. 57-12, PAGEID # 2878-2879 (Williams email to Victoriano, Sept. 11, 2015, at 2-3). Ms. Williams again concealed her interview with Ms. O'Aku, her conversation with Mr. Hardesty (who had already provided her an explanation as to his short call times), and her conversation with Mr. Weiler (who indicated Kroger was unable to pull specific call data to show whether an individual had declined or released a call). (*Id.*).

Additionally, Ms. Williams falsified what Ms. Whitlow told her. In particular, Ms. Williams stated that she was told this happened "at least 3 times." R. 57-12, PAGEID # 2878 (Williams email to Victoriano, Sept. 11, 2015, at 2). But there is no record evidence that anyone ever claimed that Mr. Hardesty declined inbound calls three or more times. Ms. Williams's statement to that effect in her email is a complete fabrication. Instead, while Ms. Whitlow's emailed statement does reference "releasing calls," R. 45-11, PAGEID # 1359 (Whitlow email to Williams, Sept. 10, 2015, at 1), Ms. Whitlow testified that she only recalled seeing Mr. Hardesty release a call one time, R. 29, PAGEID # 515 (Whitlow Dep. 101:19-23), and Ms. Williams testified to Ms. Whitlow only telling her about one released call. R. 30, PAGEID # 595 (Williams Dep. 231:15-232:24)

Ms. Victoriano responded less than two hours later—without reviewing any other evidence, and without knowing that Ms. Williams had omitted some key

evidence and exaggerated or fabricated other evidence—and told Ms. Williams that she agreed with "separating" Mr. Hardesty, and that "[i]f he admits it, you could terminate or offer the option to resign. If he does not, I would separate him based on his actions and dishonesty." R. 28, PAGEID # 446-447 (Victoriano Dep. 60:22-63:4); R. 57-12, PAGEID # 2878 (Victoriano email to Williams, Sept. 11, 2015, at 2). Simply put, Ms. Victoriano placed a rubber stamp on the decision based upon nothing more than what was provided to her by Ms. Williams in the email.

Immediately thereafter, Ms. Williams decided to terminate Mr. Hardesty. R. 57-12, PAGEID # 2878 (Williams email to Schiff, Sept. 11, 2015 at 2); R. 45-10 PAGEID # 1357 (Joe Hardesty – Recap of events at 1). At that time, Ms. Williams testified that she had no proof Mr. Hardesty committed the act except for Ms. Whitlow's accusation (which, again, was directly contradicted by the concealed eyewitness statement of Ms. O'Aku). R. 31, PAGEID # 627 (Williams Dep. at 353:11-18).

In terminating Mr. Hardesty the following Monday, Ms. Williams finally informed Mr. Hardesty that he had been accused of releasing inbound calls. R. 25, PAGEID # 222 (Hardesty Dep. 71:10-72:2); R. 45-10, PAGEID # 1357-1358 (Joe Hardesty – Recap of events at 1-2). However, Ms. Williams would not inform him who had accused him, or give any evidence of the accusation, instead simply

stating she had looked at the "numbers" and shorter call times—even though she

knew that call-time data was irrelevant to the issue of declined calls—talked to the

leadership team, and decided to terminate. *Id.* In this conversation, Mr. Hardesty

again denied that he had done what he was accused of, stating that he works hard,

has had a good evaluation, and that he wouldn't do something like this. *Id.* Mr.

Hardesty was then escorted out of the building. *Id.*

Ms. Williams terminated him even though she conceded that at that time of

his termination she didn't know if she believed Mr. Hardesty or not: "[a]t that time,

I don't know if I could say I believed him or I didn't." R. 30, PAGEID # 605

(Williams Dep. 273:12-13).

Kroger has an established progressive disciplinary policy in its handbook

which applies to CoRE employees. R. 28, PAGEID # 441 (Victoriano Dep. 41:2-

13. The policy provides that:

> Generally, routine problems with an office associate are discussed and
> corrected on a day to day basis. However, if a problem continues over
> a period of time, disciplinary action will be taken. Initial action will
> consist of a discussion between the Manager and the associate.
> Probation may be recommended. If the problem persists, a written
> reprimand will be made. Further problems can result in suspension or
> discharge.
>
> At the time of the initial discussion, the Manager should make complete
> notes of the discussion for future reference. The Manager should detail
> the problem, the associate's explanation, and the time frame for
> improvement.

> To ensure uniform handling of performance problems, the Human Resources Department should be involved in discussing any further discipline.

R. 57-5, PAGEID # 2867 (Disciplinary Action policy in employee handbook). The phrase "routine problems" is not defined anywhere in the handbook. Further, the plain language of the policy implies that "routine" problems are handled and corrected day to day, while "problems" continuing over a period of time will require disciplinary action.

As to the policy's application, Ms. Williams testified that she was unaware of the handbook's policy, but that she would "usually refer to whatever the policy or whatever one of our guidelines stipulate when I am doing any kind of coaching or discipline…" R. 30, PAGEID # 565 (Williams Dep. 112:4-7). In disciplining employees, Ms. Williams also stated she "will usually have a conversation depending on severity of the issue, the nature, all the circumstances involved in that." R. 30, PAGEID # 566 (Williams Dep. 117:19-22). She would typically provide a "verbal warning" or "written warning" if it is something that can be coached, and "if it occurs again, usually we have something called a PIP, a performance improvement plan." R. 30, PAGEID # 566-567 (Williams Dep. 117:19-118:10). Indeed, Ms. Williams's team had applied such a progressive policy to multiple individuals, including Brittany Walker (a younger woman) for failure to timely respond to requisitions within 48 hours, *see* R. 31, PAGEID #

644-645 (Williams Dep. 422:18-423:23); 57-28, PAGEID # 2913 (Performance Concern report, Apr. 21, 2015), Ellen Martin (a younger woman) for failure to schedule a minimum number of interviews in the week, *see* R. 31, PAGEID # 646 (Williams Dep. 427:8-430:20); R. 57-32, PAGEID # 2919-2920 (Report of warning, Oct. 7, 2015), Steven Hollowell (a younger man) for 3 offenses related to attention to detail and/or judgment, *see* R. 31, PAGEID # 645 (Williams Dep. 425:8-426:21); R. 57-30, PAGEID # 2915-2917 (Associate Performance Warning Notice & Improvement Plan, Oct. 19, 2015), and Dominic Martin (a younger African American man) for other "Customer 1st issues," including sending candidates to the wrong locations. R. 30, PAGEID # 569-570 (Williams Dep. 127:5-130:16). All of these individuals on the mass hire team received either verbal coaching or some lesser form of discipline than an immediate termination on their first offense.

Ms. Williams did not apply or follow the policy with Mr. Hardesty. Prior to his termination, she provided Mr. Hardesty no warning, no opportunity for improvement, nothing of the sort. Mr. Hardesty was also not informed of the accusation or reason for termination until after the decision to terminate had already been made.

Ms. Williams also treated the accusation against Mr. Hardesty, which she alleges was a "Customer 1st Issue," in an entirely different manner than a similar

accusation against another subordinate, Luvenia Orso, a younger African American woman who was accused of committing a Customer 1st Violation. In particular, on or about September 2, 2015 (a week before Plaintiff's termination), Plaintiff was made aware that Ms. Orso had failed to inform him of two open job requisitions for new stores assigned to him. R. 44-1, PAGEID # 1304 (Declaration of Joseph Hardesty, ¶ 10). Recruiting Administrators ("Admins") are tasked with assisting Recruiters with their day-to-day operational activities associated with the recruiting function, including screening and scheduling calls. R. 47-2, PAGEID # 1412-1413 (Recruiting Administrator position profile at 1-2). As part of these duties, Admins are required to notify Recruiters when they receive new job requisitions assigned to them (i.e., a new store opening for which applicants may apply). R. 44-1, PAGEID # 1304 (Declaration of Joseph Hardesty, ¶ 11); R. 29, PAGEID # 513 (Whitlow Dep. 93:8-11). As confirmed by both Mr. Hardesty and Ms. Whitlow, if an Admin fails to inform a Recruiter of these requisitions, it will result in significant numbers of online applicants applying and sitting delinquently in Kroger's systems without ever receiving a screening call. R. 29, PAGEID # 513 (Whitlow Dep. 93:3-11); R. 44-1 PAGEID # 1304 (Declaration of Joseph Hardesty, ¶ 12).

Ms. Orso failed to inform Mr. Hardesty of two new store requisitions, resulting in over 300 online applicants sitting delinquent in Kroger's systems. R.

44-1, PAGEID # 1304 (Declaration of Joseph Hardesty, ¶ 13). When Mr. Hardesty became aware of this issue, he informed his supervisor, Courtney Strosnider, of the problem and asked that he be taken out of his regular phone duties so he could catch up with these calls. R. 45-9, PAGEID # 1356 (Hardesty email to Strosnider, Sept. 2, 2015). Shortly thereafter, Mr. Hardesty had a follow-up conversation with Ms. Strosnider, in which he discussed that Ms. Orso had not informed him about these requisitions and that he had a great deal of applicants sitting delinquent in the system. R. 44-1, PAGEID # 1304 (Declaration of Joseph Hardesty ¶14).

The following day, Mr. Hardesty was called into Ms. Williams' office, and questioned as to why he was out of his regular phone loop. R. 44-1, PAGEID # 1304 (Declaration of Joseph Hardesty, ¶ 16-17). Mr. Hardesty explained to Ms. Williams that Ms. Orso had failed to inform him of the two new requisitions, and that his supervisor had asked him to go into a special call mode to catch up. R. 44-1, PAGEID # 1304 (Declaration of Joseph Hardesty, ¶ 18). In response, Ms. Williams sternly directed Mr. Hardesty to go back into the regular phone loop, though she never investigated, coached, or ever discussed the issue with Ms. Orso. R. 30, PAGEID # 592 (Williams Dep. 219:9-12); R. 29, PAGEID # 513 (Whitlow Dep. 93:12-17).

Similar to the accusation against Mr. Hardesty, this failure on the part of Ms. Orso raised a violation of the Customer 1st Promise; Ms. Williams and Ms.

Victoriano both considered applicants to be the "customers" of CoRE. R. 30, PAGEID # 594 (Williams dep. 229:15-25); R. 28, PAGEID # 452 (Victoriano dep. 82:24-83:7). In particular, 300 applicants were sitting in Kroger's system without receiving a call on their applications. As a result, the stores to which the applicants applied received no applicants for positions, delaying their hiring process. As such, this failure was a Customer 1st Issue, yet was not treated in any similar fashion to the way in which the unfounded accusation against Mr. Hardesty was treated.

Following Mr. Hardesty's termination, he sued Kroger in the Southern District of Ohio, alleging discrimination on the basis of his race, gender, and age in violation of Title VII of the Civil Rights Act of 1967, 42 U.S.C. 2000e et seq. (as amended) and the Age Discrimination in Employment Act, 29 U.S.C. 623 et seq. ("ADEA"). *See* R. 1, PAGEID # 1-10 (Complaint); R. 14, PAGEID # 50-59 (First Amended Complaint). Kroger moved for summary judgment, R. 32, PAGEID # 671-687, which was opposed by Plaintiff, R. 44, PAGEID # 1261-1305, and fully briefed prior to the district court rendering a decision in Kroger's favor. R. 67 PAGEID # 3854-3876 (Summary Judgment Decision).

In finding for Kroger, the district court correctly found that Mr. Hardesty had met all elements of his prima facie case as to age, race, and gender discrimination. R. 67, PAGEID # 3863-3865 (Order Granting Summary Judgment, pgs. 10-12). However, after finding Kroger had set forth a legitimate,

nondiscriminatory reason for his termination (releasing an inbound call), the court

incorrectly found that Mr. Hardesty could not prevail because Kroger established

its honest-belief defense. R. 67, PAGEID # 3865-3876 (Summary Judgment

Decision). In particular, the district court found that, regardless of whether Mr.

Hardesty had shown Kroger's proffered nondiscriminatory reason to be false,

Kroger had an honestly held belief in the reason for Mr. Hardesty's termination as

set forth in *Smith v. Chrysler Corp.*, 155 F.3d 799 (6th Cir. 1998). R. 67, PAGEID

# 3866-3870 (Summary Judgment Decision at 13-17). Additionally, the district

court found that Mr. Hardesty had not set forth sufficient evidence to establish that

Kroger's reason was insufficient to warrant termination. R. 67, PAGEID # 3870-

3876 (Summary Judgment Decision at 17-23). This appeal followed.

## SUMMARY OF ARGUMENT

The district court erred in its determination that Kroger established an honest-belief defense to Mr. Hardesty's discrimination claims. Mr. Hardesty alleges that he was terminated from his job at a Kroger call center on the basis of his age, race, and sex. Kroger countered that it had a nondiscriminatory reason for the termination—namely, that Mr. Hardesty declined an incoming call. Mr. Hardesty responded with evidence of pretext—that the proffered reason had no basis in fact.

Even though the district court found that Mr. Hardesty had satisfied all of his burdens under *McDonnell Douglas*, it granted summary judgment to Kroger based upon the honest-belief defense by finding there was no evidence that the decisionmaker's belief in the proffered nondiscriminatory reason for termination was not "honestly held." In order to establish the honest-belief defense, an employer must show (1) that its decisionmaker subjectively held an honest belief in the proffered nondiscriminatory reason for the employment decision at issue, and also (2) that the belief was objectively reasonable in light of particularized facts that were known at the time the decision was made. The "key inquiry" is whether the employer made "a reasonably informed and considered decision before taking an adverse employment action."

Here, the district court granted summary judgment to Kroger on this basis even though the record showed the existence of a genuine issue of material fact on both elements of the honest-belief rule. As to the first element (that the decisionmaker subjectively held an honest belief in the proffered nondiscriminatory reason), the record contains evidence from which a reasonable jury could have concluded that the decisionmaker did not subjectively hold an honest belief in the proffered nondiscriminatory reason. First, the decisionmaker lied to the management team about the extent of the alleged conduct. Specifically, even though one single employee reported that Mr. Hardesty had declined one single call one time, the decisionmaker falsely told the management team that she "was told this happened at least 3 times." Second, the decisionmaker concealed from the management team—and from all documentation regarding her investigation—that she had interviewed an eyewitness who exonerated Mr. Hardesty. Even though the decisionmaker interviewed that eyewitness—who was conversing directly with Mr. Hardesty at the time he allegedly declined a call—the decisionmaker did not tell the management team either that there was an eyewitness, or that the eyewitness refuted the accuser's claim. Third, the decisionmaker presented non-corroborative evidence (in the form of call-length data) as if it supported her assertion that Mr. Hardesty declined a call. The decisionmaker was expressly advised by the phone system's project manager that

the call-length data did not show declined calls, and yet the decisionmaker nevertheless presented that data to the management team and told them that it identified Mr. Hardesty as a "definite outlier[]." Fourth, whatever the decisionmaker later believed, she specifically testified that at the time she fired Mr. Hardesty, she didn't know whether she subjectively believed he had declined a call. The district court erred by granting summary judgment; this evidence was sufficient to convince a reasonable jury that the decisionmaker did not subjectively hold an honest belief in the proffered nondiscriminatory reason for termination.

The record also contains sufficient evidence from which a reasonable jury could have found in favor of Mr. Hardesty on the second element of the honest-belief defense (that the belief be objectively reasonably informed and considered in light of particularized facts), for at least two reasons.

First, all of the evidence showing that the decisionmaker lacked a subjectively held honest belief is also relevant to the objective reasonableness of that belief. In other words, a decision is objectively not "reasonably informed and considered" where it is based on lies about the strength of evidence against the employee, on lies about the existence of exculpatory evidence, and on use of data that is known by the decisionmaker to be irrelevant to the proffered nondiscriminatory reason for termination. And a decision is objectively not

"reasonably informed and considered" when the decisionmaker does not even subjectively believe the reason herself.

Second, a decision is objectively not "reasonably informed and considered" when the decisionmaker expressly states that she refused to consider exculpatory evidence. That is what happened here. The decisionmaker testified, without explanation, that she simply did not "factor in" to her decision the fact that another employee—who was speaking to Mr. Hardesty at the time—refuted the claim that Mr. Hardesty declined a call. A reasonable jury could have concluded that in light of this evidence (together with the evidence described above) that Mr. Hardesty's termination was not reasonably informed and considered. The jury should have heard that evidence, and the district court erred in granting summary judgment.

Finally, the district court also erred in determining that Mr. Hardesty could not show that his alleged conduct was insufficient to motivate his termination. While Kroger claimed that the alleged conduct was a violation of its "Customer 1st" policy and that it had zero tolerance for violations of that policy, the record contains the following contrary evidence: First, Kroger's disciplinary policy calls for progressive discipline for violations, not zero tolerance. Second, Mr. Hardesty was an exemplary employee who had had no prior disciplinary action taken against him. Third, other similarly situated employees who were not members of the protected class received either light discipline or no discipline at all for similar

alleged violations of company policy. A reasonable jury could have concluded that the alleged conduct—even if true—did not warrant termination, and instead was the result of discrimination.

Mr. Hardesty produced enough record evidence to create a genuine issue of material fact on all of these issues. A jury, not a judge on summary judgment, must decide those contested issues of fact. The decision below must be reversed, and the case must be remanded for trial.

## ARGUMENT

The district court erred by holding that Kroger established its honest-belief defense. There was sufficient evidence for a jury to hear and decide whether the reason proffered for Mr. Hardesty's termination lacked a basis in fact or was insufficient to warrant termination (i.e., was a pretext for discrimination). This Court should reverse the district court's decision and remand for trial.

### A.    Standard of Review

This Court reviews a district court's grant of summary judgment de novo. *Williams v. Ford Motor Co*., 187 F.3d 533, 537 (6th Cir. 1999). "Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). *See also Eastman Kodak Co. v. Image Technical Services, Inc*., 504 U.S. 451, 456 (1992). At the summary judgment stage, the court determines whether there are genuine disputes of material fact that should go to a jury; it does not find facts. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252-252. There is a genuine dispute of material fact if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*. at 249.

### B.    The "honest belief" rule requires (1) that an employer subjectively holds an honest belief in an articulated non-discriminatory reason

**for termination, and (2) that the belief be formed in objectively reasonable reliance on particularized facts known at the time the decision was made.**

Mr. Hardesty's claims for race, age, and gender discrimination are subject to the *McDonnell Douglas* burden-shifting framework. Under this test, an employee must first make out a prima facie showing of discrimination, and if he does, then the employer "has the burden to articulate a nondiscriminatory reason for the adverse employment action." *Marshall v. Rawlings Co.*, 854 F. 3d 368, 379 (6th Cir. 2017). If the employer meets that burden, then the employee has the burden of showing that the proffered nondiscriminatory reason was pretext—meaning that the employee must show *either* "that the proffered reason had no basis in fact, did not motivate the termination, *or* was insufficient to warrant the termination." *Id.* (emphasis added).

If the plaintiff meets this burden and the defendant is silent in the face of the plaintiff's evidence, then the case proceeds to trial for a jury to weigh the evidence. *Clay v. UPS*, 501 F.3d 695, 715 (6th Cir. 2007). However, the employer does have one last opportunity to prevail on summary judgment by establishing that its belief in the proffered reason for termination, even if mistaken, was honestly held. This rule—which is essentially an affirmative defense to a claim of pretext—provides that, "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot

establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Smith v. Chrysler Corp.,* 155 F.3d 799, 806 (6th Cir.1998).

In the Seventh Circuit's original articulation of the rule, an employer could avoid trial simply by providing an "honest reason" for firing the employee, demonstrating its subjective belief in the reason for termination was "honestly held." *Id.* The Sixth Circuit modified this standard, however, holding that the employer must not only set forth such a subjective honest reason, but in addition must also demonstrate that "the employer *reasonably* relied on the particularized facts that were before it at the time the decision was made." *Id.* at 806 (emphasis added). The "key inquiry" on this point is whether the employer can show it made "a *reasonably* informed and considered decision before taking an adverse employment action." *Id.* at 807 (emphasis added). In other words, the Sixth Circuit has required an additional showing that the honest belief be objectively reasonable.

Thus, an employer cannot obtain summary judgment under the honest belief rule if there is record evidence from which a reasonable jury could conclude *either* that the employer did not honestly believe the non-discriminatory basis for the employment decision, *see Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012) (employee could "produce sufficient evidence from which the jury could reasonably reject the defendants' explanation and infer that the defendants did not honestly believe in the proffered nondiscriminatory reason for its adverse

employment action") (cleaned up), *or* that employer did not reasonably rely on particularized facts to make a reasonably informed and considered decision. *See Smith*, 155 F.3d at 807-808 (employee could show that defendant "failed to make a reasonably informed and considered decision before taking its adverse employment action."). If a plaintiff produces evidence on either of these points, summary judgment is not proper.

Finally, this Court has cautioned that "[a]lthough courts should resist attempting to micro-manage the process used by employers in making their employment decisions, neither should they blindly assume that an employer's description of its reasons is honest." *Id.* at 808. Which is to say, normal summary judgment rules apply. A district court's role is not to decide which party it believes, and it certainly cannot defer to an employer—the court's job is to determine whether there is record evidence from which a jury could conclude that the proffered reason was not the employer's honestly held belief or not reasonably informed and considered in light of the particularized record facts.

Here, even though Mr. Hardesty produced evidence showing that the proffered reason had no basis in fact and was insufficient to warrant termination, the district court granted summary judgment to Kroger under the honest belief rule. This was an error. There is record evidence supporting the plaintiff, and thus there is a genuine issue of material fact for trial, on *both* elements of the honest-belief

rule. A reasonable jury could conclude that Kroger's decisionmaker, Daniele Williams, did not subjectively honestly believe the proffered reason for Mr. Hardesty's termination. A reasonably jury also could conclude that, regardless of what Ms. Williams might have subjectively believed, Kroger failed to make a reasonably informed and considered decision based on reasonable reliance on particularized facts that were known before the adverse employment action was taken. And a reasonable jury could conclude that the proffered reason was not sufficient to warrant termination.

### C. The decisionmaker did not subjectively honestly believe that Mr. Hardesty declined an incoming call.

The district court erred by disregarding at least four key pieces of record evidence from which a reasonable jury could conclude that decisionmaker Daniele Williams did not subjectively believe that Mr. Hardesty declined an incoming call.

First, Ms. Williams lied about the evidence against Mr. Hardesty. More specifically, she made a lie of commission by reporting to her HR partner that Mr. Hardesty declined "at least 3" calls. *See* R. 57-12, PAGEID # 2878 (Williams email to Victoriano, Sept. 11, 2015, at 2). The truth is that there is no record evidence, of any type, from any witness or source, that Mr. Hardesty declined three calls (much less that he declined "at least" three calls). Instead, Ms. Whitlow accused Mr. Hardesty of declining *one* call. That's what Ms. Williams testified to under oath, when she recounted her conversation with Ms. Whitlow:

Q.      Okay. And what did [Briana Whitlow] say to you?
A.      She said roughly, *I hate to bring this up, but I just saw Joe hang up on a customer*.
Q.      She said customer?
A.      I don't know. Customer, candidate. She said one of them.
Q.      Okay. *And that was for one instance?*
A.      *Yes.*
Q.      And what did you – how did you respond.
A.      I said, walk me through what you saw?
Q.      And did she walk you through it?
A.      Yes.
Q.      And tell me what exactly she said.
A.      I can't say it verbatim. Roughly what she said was, she was talking to Carly, I believe and Carly was on the phone. And there are benches next to – in their cubes. She was sitting on the edge of Carly's bench waiting for her to get off the phone. Aretha was talking to Joe. *She was looking over and noticed that he was talking and turned around and disconnected the call* because the light was on. She could tell because the light came on. Because you don't hear phones ringing. It is in the ear of the person that has their headset on. *So she said she saw him disconnect the call* and then go into an aux code and then turn around and resume his conversation with Aretha.

[…]

Q.      Okay. Anything else that Briana said?
A.      No. Not that I recall.

R. 30, PAGEID # 595 (Williams Dep. 230:13-232:24) (emphases added).

Ms. Whitlow's testimony was similar—she also could only remember one allegedly declined or released call:

Q.      Okay. Do you recall – was this just one occasion that he pressed that button?
A.      I remember at least once. I'm not sure if it was more than once. But I can recall at least one time.

R. 29, PAGEID # 515 (Whitlow Dep. 101:19-23).

35

At Ms. Williams' request, Ms. Whitlow then followed up the conversation with an email—and while this time Ms. Whitlow uses a plural term, there still is no mention of three calls or "at least" three calls:

> As I was speaking with Carly about scheduling a candidate, I noticed Joe [Hardesty] was releasing calls (hanging up on candidates) that were coming through to his phone while he was in mid conversation with Aretha [O'Aku]. I just wanted to inform you. This was roughly between 3:15pm and 3:30pm today. Thanks!

R. 45-11, PAGEID # 1359 (Whitlow email to Williams, Sept. 10, 2015, at 1).

Ms. Williams' lie about Mr. Hardesty and his conduct is evidence of both her subjective bad faith and her consciousness of guilt. As the Supreme Court stated in *Reeves v. Sanderson Plumbing Products*—also an ADEA case—"In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that *the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'*" 530 U.S. 133, 147 (2000) (emphasis added). This is true in many contexts. Lies are excluded from hearsay under Evid.R. 801(d)(1)(A) because of their strong probative value. They are also admissible under Evid.R. 404(b)(2) to prove a party's motive or intent (and of course "the focus of a discrimination suit is on the intent of the employer," *Clay v. UPS*, 501 F.3d 695, 715 (6th Cir. 2007)). Even this Court's own pattern jury instructions

advise jurors that a witness's lie can be relevant to her credibility and the strength of her claim or defense. *See Sixth Circuit Pattern Jury Instructions* at § 1.07 (Credibility of Witnesses), *available at* https://perma.cc/TTW7-Y35Q.

Ms. Williams's lie about Mr. Hardesty's conduct is material evidence disputing the employer's claim to have held a subjectively honest belief. The jury was entitled to hear it, and the district court erred by finding that it did not present a genuine issue for trial.

The second piece of evidence from which a jury could have found that Ms. Williams did not have a subjectively held honest belief that Mr. Hardesty declined a call is that *she lied about it again*. This time it was a lie of *omission*, when Ms. Williams failed to document that Aretha O'Aku—who was talking to Mr. Hardesty at the time and thus was in the best position to see whether Mr. Hardesty declined a call—said it didn't happen. Despite having just interviewed Ms. O'Aku about the incident, when Ms. Williams made her report to HR rep Diana Victoriano, she completely failed to mention that Ms. O'Aku was an eyewitness and that her account undermined Ms. Williams's purported reasons for firing Mr. Hardesty. In fact, Ms. Williams's email to Ms. Victoriano specifically creates the impression that there was only one eyewitness (Ms. Whitlow). Ms. Williams told Ms. Victoriano that "I do have a statement from the person that witnessed this action and reported it to me." R. 57-12, PAGEID # 2878 (Williams email to Victoriano,

Sept. 11, 2015, at 2). Ms. Williams chose to say that she had "a statement"—

singular—from "the person" who witnessed it—also singular—even though she

knew that she had *two* statements from *two* eyewitnesses, one of whom supported

Mr. Hardesty's denial of the accusation. Ms. Victoriano later testified that all she

knew, apparently up to and including the time of her deposition in October 2016,

was what Ms. Williams told her in that email:

> Q.    Okay. Do you know who the recruiter was that Mr. Hardesty was
> in a conversation with? I'm sorry. You said a co-worker. Do you know
> who it was that he was in a conversation with?
> A.    I don't recall.
> Q.    Were you made aware of who he was in a conversation with?
> A.    I don't recall who it was.
> Q.    Do you recall if you were ever told who it was?
> A.    I don't recall.

R. 28, PAGEID # 443 (Victoriano Dep. 48:13-23).

> And then:

> Q.    Did you have any other knowledge with respect to this situation
> that Ms. Williams has sent you in this e-mail, other than what she has
> provided to you in that e-mail?
> A.    No.

R. 28, PAGEID # 447 (Victoriano Dep. 62:25-63:4).

Ms. Williams deliberately concealed exculpatory evidence from Ms.

Victoriano, her HR partner.

And Ms. Victoriano wasn't the only person from whom Ms. Williams

concealed evidence. The district court noted that Ms. Williams also consulted first

with Rana Schiff, the CoRE operations manager, and later with Buck Moffett, the

CoRE director. R. 67, PAGEID # 3859-3860 (Summary Judgment Decision at 6-

7). But, like Ms. Victoriano, both Ms. Schiff and Mr. Moffett had no idea that Ms.

Williams had exculpatory eyewitness evidence that she had not disclosed to them.

In Ms. Schiff's 2017 deposition, she similarly denies having any recollection

that anyone had spoken with Ms. O'Aku or of what Ms. O'Aku had said:

> Q.    Okay. It also mentions in here under Thursday, September 10th
> that Joe was allegedly releasing calls while he was in a conversation
> with another recruiter. Do you know who that other recruiter was?
> A.    I believe it was Aretha.
> Q.    Is her last name O'Aku?
> A.    Yes.
> Q.    Did anyone speak with Aretha?
> A.    I don't know.
> Q.    Did anyone ever tell you she spoke with Aretha?
> A.    I don't recall.
> Q.    Did Daniele Williams ever tell you she spoke with Aretha?
> A.    I don't recall.

R. 51, PAGEID # 2211-2212 (Schiff Dep. Part II, 64:11-65:9).

Mr. Moffett also specifically denies all knowledge of whether anyone ever

spoke to Aretha O'Aku:

> Q.    Okay. There is a reference in this to an Aretha; do you know who
> that is?
> A.    I would assume that it would be Aretha on the mass hire team.
> Q.    Okay. Do you know if anyone ever spoke with Aretha?
> A.    I do not.
> Q.    Did you ever speak with Aretha?
> A.    I did not.
> Q.    Did you ever ask anyone to speak with Aretha?
> A.    I don't recall asking anyone to speak with Aretha.

R. 27, PAGEID # 403 (Moffett Dep. 171:2-14).

Not only did Ms. Williams fail to tell Ms. Victoriano, Ms. Schiff, and Mr. Moffett about the exculpatory evidence, but she also conspicuously omitted it from the "recap of events," a document that she created to memorialize her investigation. *See* R. 45-10, PAGEID # 1357-1358 (Joe Hardesty — Recap of events at 1-2). That recap document (which Ms. Williams later emailed to Ms. Victoriano, Ms. Schiff, and Mr. Moffett; *see* R. 57-20, PAGEID # 2897-2899 (Williams email, Sept. 15, 2015), authenticated at R. 31, PAGEID # 623 (Williams Dep. 335:21-336:13)), has some dozen bullet points, comprising nearly 2000 words, spanning four days, and includes minutiae such as timestamps down to the minute on some entries—but somehow makes *no mention at all* of even the *existence* of another eyewitness, much less that her statement exculpates Mr. Hardesty.

The district court expressly cited Ms. Williams's "consultations" with Ms. Victoriano and Ms. Schiff as supporting the honest belief defense. R. 67, PAGEID # 3859 (Summary Judgment Decision at 6). It also expressly said that Mr. Moffett's subsequent review (with Ms. Williams and Ms. Schiff) of "how Mr. Hardesty's side of the story 'aligned with what [evidence] they had seen and how they viewed the situation' . . . allowed Mr. Moffett to 'really understand the sequence of events that led up to [Mr. Hardesty's] termination and how the

decision was made[.]'" R. 67, PAGEID # 3860 (Summary Judgment Decision at 7) (internal citations omitted; quoting Moffett dep). The district court said that this post-termination review also supported the honest belief defense. *Id.* The district court plainly treated these actions as evidence of Ms. Williams's good faith and thorough investigation. But neither the consultations with Ms. Victoriano and Ms. Schiff, nor the post-termination review with Mr. Moffett and Ms. Schiff, could possibly have supported the honest belief defense. In her conversations with them, Ms. Williams intentionally and secretly kept Ms. Victoriano, Ms. Schiff, and Mr. Moffett in the dark about what evidence she had seen, how she viewed the situation, and the sequence of events that led up to the termination and how the decision was made. She also intentionally omitted that evidence from her written "recap" of the investigation.

"[A] lie of omission is still a lie," *US v. Norman*, 87 F. Supp. 3d 737, 745 (E.D. Penn. 2015),[3] and a lie is evidence of consciousness of guilt. "Common experience tells us that it is more likely than not that the employer who lies is simply trying to cover up the illegality alleged by the plaintiff." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 536 (1993) (Souter, J., dissenting) (internal quotations omitted). A jury, if presented with the evidence that Ms. Williams intentionally

---

[3] Citing *Star Trek: The Next Generation, The First Duty* (syndicated television broadcast Mar. 30, 1992): "You told the truth up to a point, but a lie of omission is still a lie."

concealed Ms. O'Aku's statement from Ms. Victoriano, Ms. Schiff, and Mr. Moffett (and from her written recap) could reasonably have concluded that Ms. Williams lacked a subjectively held honest belief that Mr. Hardesty declined a call. The district court erred when it granted summary judgment and took that question away from the jury.

The third piece of evidence from which a jury could have found that Ms. Williams did not have a subjectively held honest belief that Mr. Hardesty declined a call is that she misled Ms. Victoriano (and possibly others) about the relevance of the call statistics provided by project manager Chris Weiler. At Ms. Williams's request, Mr. Weiler provided a summary of information about average call times for Mr. Hardesty, other members of the mass hire team, and CoRE as a whole. But Mr. Weiler cautioned that he could not provide data about any specific incoming calls, and thus could not show whether Mr. Hardesty or anyone else had declined an incoming call. *See* R. 48, PAGEID # 1559 (Weiler Dep. 32:13-19). *See also* R. 45-10, PAGEID # 1357 (Joe Hardesty — Recap of events at 1) (Weiler "mentioned [to Williams] that we did not have the capabilities to pull up individual recruiters regarding specific incoming calls . . . .").

Despite Mr. Weiler's words of warning, in her "consultation" with Ms. Victoriano, Ms. Williams presented the data from Mr. Weiler as if it supported her assertion that Mr. Hardesty declined a call (or rather, that Mr. Hardesty declined

"at least 3" calls). More specifically, Ms. Williams's email to Ms. Victoriano references the declined call, summarizes "the data" from Mr. Weiler that shows "there are definite outliers with" Mr. Hardesty, and then states that "There is no tolerance for our recruiters to hang up on customers." R. 57-12, PAGEID # 2878 (Williams email to Victoriano, Sept. 11, 2015, at 2). Ms. Williams's email is constructed to create the impression that "the data"—the description of which makes up about half of the substantive content of the email—supports the allegation that Mr. Hardesty declined a call, even though Ms. Williams knew (from Mr. Weiler) that it did not. Ms. Victoriano, who had no way of knowing at the time that the data did not support the conclusion that Mr. Hardesty declined a call (and who also had no way of knowing that Ms. Williams *knew* the data did not support that conclusion) was induced to believe that there was solid evidence showing that Mr. Hardesty declined a call. If a jury knew that Ms. Williams misled Ms. Victoriano (and possibly others) about the significance of this data, it could reasonably have concluded that Ms. Williams did not subjectively believe that Mr. Hardesty declined a call.[4]

_____

[4] Note too that even if the data (which showed that Mr. Hardesty's calls in the week preceding his termination were shorter than average) were accurately described and even if the accurate description were used as a basis to terminate Mr. Hardesty, there still is at least one other potential innocent explanation for it. Shortly before he was fired Mr. Hardesty learned that a recruiting coordinator named Luvenia Orso had failed to inform him of two open job requisitions for new stores assigned to him, even though it was her job to assist Mr. Hardesty by doing so (among other

The fourth piece of evidence from which a jury could have found that Ms. Williams did not have a subjectively held honest belief that Mr. Hardesty declined a call is that *Ms. Williams herself testified that she was not sure at the time whether she believed that Mr. Hardesty declined a call*. The district court correctly cited Ms. Williams's testimony that at the time she was giving her deposition—in January 2017—she believed that Mr. Hardesty declined a call. *See* RE 67, PAGEID # 3860 (Summary Judgment Decision at 7). But the test is not what the decisionmaker believed when as of the date of her testimony, some sixteen months after firing Mr. Hardesty. The test is what she believed *at the time the decision was made*. On *that* question, Ms. Williams testified that she did not know at the time whether she believed that Mr. Hardesty had declined the call; she was unsure:

Q.  [Hardesty] stated, Of course not. I would never do that. Did you believe him?

A.  I don't know. At that time, I don't know if I could say I believed him or I didn't.

R. 30, PAGEID # 606 (Williams Dep. 273:9-13).

It is axiomatic that a decisionmaker's belief cannot have been subjectively, honestly held at the time of Mr. Hardesty's firing if it was not held *at all* at the

---

things). This produced a backlog of over 300 applicants, and Mr. Hardesty was required to call on all of them as quickly as possible. It stands to reason that Mr. Hardesty's average call times were shorter when he—through no fault of his own—was suddenly presented with a huge backlog that he had to work through quickly. (Incidentally Ms. Orso, a younger African-American woman, was not disciplined or terminated over her failure to fulfill her fundamental job duty.)

time of Mr. Hardesty's firing. A reasonable jury could have concluded from this evidence that Ms. Williams did not believe that Mr. Hardesty declined a call. The district court's grant of summary judgment was improper because it took that question away from the jury.

The district court weighed all of the evidence and concluded that Ms. Williams subjectively and honestly held the belief that Mr. Hardesty declined a call. That would be appropriate for a district judge to conclude in a bench trial, or as a member of a jury. But it is not a proper exercise of summary judgment. The district court should have acknowledged the record evidence showing that Ms. Williams did not subjectively hold an honest believe that Mr. Hardesty declined a call—including the concealment of exculpatory evidence from her report and communications to Ms. Victoriano, Ms. Schiff, and Mr. Moffett; the exaggeration of the evidence against Mr. Hardesty; her acknowledgement that the call-length data was irrelevant; her knowledge that Ms. Orso had failed to advise Mr. Hardesty of the requisitions; and her failure to discipline younger, non-caucasian employees (including Ms. Orso)—and denied summary judgment.

**D.    Regardless of what the decisionmaker subjectively believed, the decision was not objectively reasonably informed and considered.**

The district court also erred by determining that the employer's decision was objectively reasonably informed and considered in light of reasonable reliance on particularized facts. There are at least three reasons why the jury, and not the judge

on summary judgment, should have determined this aspect of Kroger's honest-belief defense.

First, because Ms. Williams was both the investigator and the decisionmaker, all of the evidence showing that Ms. Williams lacked a subjectively held honest belief also supports the conclusion that the decision was objectively unreasonable. Put simply, a jury could have decided that (and must decide whether) it was objectively unreasonable for Ms. Williams to rely on her own outright lies, her own misleading descriptions of other evidence, and her own actual uncertainty at the time.

Second, even though she had actual knowledge of Ms. O'Aku's statement that Mr. Hardesty did not decline a call, Ms. Williams inexplicably said she did not consider Ms. O'Aku's eyewitness statement *at all*:

> Q.    Well, let me rephrase it. Did the fact that you spoke with Aretha play at all into the decision as to whether or not to terminate Mr. Hardesty.
> A.    No. No.
> Q.    No, it did not factor into your decision?
> A.    My overall decision, no.

R. 31, PAGEID # 618 (Williams Dep. 315:14-23).

Certainly, any employer conducting an honest and reasonably informed investigation would consider an eyewitness account of the alleged action to be at least relevant (and likely critical) to their decision. *See Martin v. Toledo Cardiology*, 548 F.3d 405, 414-415 (6th Cir. 2008) (finding that employer's

46

decision to terminate was not reasonably informed and considered where employer never approached identified eyewitness regarding what she had seen or witnessed, and who later disputed the accusations against plaintiff). Yet Ms. Williams testifies that it did not factor into her decision.

A jury could have concluded based on this evidence that any belief formed by Ms. Williams was objectively unreasonable. *See McNeely v. Kroger*, 2014 U.S. Dist. LEXIS 97262 at *42 (E.D. Mich. no. 12-12608, May 9 2014) ("An 'honest' belief is not 'honest' if it deliberately ignores the particularized facts of the situation at hand."); *Foster v. Spring Meadows Health Care Ctr., LLC*, 2013 U.S. Dist. LEXIS 31900 at *34 (M.D. Tenn. no 3:11 C 01216, March 6, 2013) ("Either Crowe simply did not speak with Henderson prior to terminating Foster, or she heard Henderson's version of the events and ignored it. Either way, a jury could fairly conclude that Crowe's investigation was not so reliable, reasonable or thorough as to trigger the honest belief rule."). It bears repeating that the evidence that Ms. Williams disregarded (1) is an eyewitness account, (2) is from the person who was in the best position to observe Mr. Hardesty's conduct, and (3) directly contradicts the only inculpatory evidence in the record. The only way that the district court could have determined that Ms. Williams's decision was objectively reasonable (despite Ms. Williams having ignored this evidence), was by weighing the evidence for and against each side and discounting the probative value of Ms.

O'Aku's statement. A jury is entitled to do that, but a court on summary judgment is not. If this evidence had been viewed in the light most favorable to Mr. Hardesty, the district court could not and would not have granted summary judgment to Kroger.

Third, it was objectively unreasonable for Ms. Williams to rely on data from an expert who expressly told her that the data did not answer the question she was trying to answer. When Ms. Williams asked project manager Chris Weiler if he could provide data showing whether Mr. Hardesty declined a call, Mr. Weiler told her that he could not. The evidence he did provide—the length of calls Mr. Hardesty actually took or made—simply has no probative value on the question of whether Mr. Hardesty refused to answer a call. They are entirely separate questions; whether Mr. Hardesty talks fast on the phone, was lucky (or unlucky) by having lots of good (or bad) candidates, or even whether Mr. Hardesty hung up on callers, has no tendency to make it more or less likely that Mr. Hardesty *declined a call* on September 10, 2015. A jury that heard the evidence that Ms. Williams relied on call-length data to support her contention that Mr. Hardesty declined a call, despite her actual knowledge that the call-length data did not in any way reflect declined calls, could have concluded that Ms. Williams's belief was objectively unreasonable. Indeed, such a decision is neither reasonably informed

and considered nor based on particularized facts. The district court erred in granting summary judgment.

### E. Whatever belief the decisionmaker held, the alleged conduct is insufficient to warrant termination.

Mr. Hardesty also demonstrated pretext through evidence that Kroger's proffered reason was insufficient to warrant his termination. In particular, Mr. Hardesty presented evidence that (1) another employee—Luvenia Orso—was similarly reported for violating Kroger's Customer 1st Promise, yet was not investigated, disciplined, or terminated for the same; and (2) that Kroger failed to apply its progressive disciplinary policy to Mr. Hardesty (instead terminating him immediately) while applying the progressive disciplinary policy to others on his team.

Beyond a showing that the proffered reason has no basis in fact, a plaintiff raises a triable jury issue by presenting evidence that the proffered reason was insufficient to motivate the action. *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 589 (6th Cir. 2002); *See also Collins v. United States Playing Card Co.*, 466 F. Supp.2d 954, 970 (S.D. Ohio 2006). The Sixth Circuit has typically grouped the first test (no basis in fact) and third test (insufficient to motivate) together because they are both "direct attacks on the credibility of the employer's proffered motivation for firing [the employee] and, if shown, provide an evidentiary basis for

what the Supreme Court has termed 'a suspicion of mendacity.'" *Jones v. Potter*, 488 F.3d 397, 406 (6th Cir.2007) *quoting Hicks*, 509 U.S. 502 at 511.

Showing the employer's proffered reason was insufficient for termination can typically include evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. *Manzer v. Shamrock Chemicals Co.*, 29 F.3d 1078 (6th Cir. 1994); *See also Russell v. University of Toledo*, 537 F.3d 596, 607 (6th Cir 2008) (Such a showing "ordinarily consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff."). However, other types of evidence are also sufficient to demonstrate the insufficiency of an employer's motivation, including an employer's failure to follow a policy related to termination or demotion, *See DeBoer v. Musashi Auto Parts, Inc.*, 124 F.App'x 387, 394 (6th Cir. 2005), citing *Skalka v. Fernald Environmental Restoration Mgmt. Corp.*, 178 F.3d 414, 421-22 (6th Cir. 1999); *See also Collins* 466 F. Supp.2d at 970-71 ("An employer's failure to follow a policy that is related to termination or demotion can constitute evidence of pretext"), or evidence of an employer's reasonableness as to its purported business decision. *See Wexler v. White's Fine Furniture*, 317 F.3d 564 (6th Cir.

2003) (finding district court erred in ignoring plaintiff's evidence regarding

whether it was reasonable to blame him for his store's declining sales, holding that

"[i]f believed, a trier of fact could reasonably infer that the justification for

Wexler's demotion was insufficient to warrant the adverse decision."). *See also*

*Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 530 (6th Cir.2005) ("Despite the

ambiguity of its policy regarding pallets and the absence of any clear evidence of

wrongdoing, FedEx chose to terminate Tisdale rather than impose a lesser sanction

such as a suspension or probation."); *See also Tuttle v. Metro. Gov't,* 474 F.3d 307,

320, 2007 U.S. App. LEXIS 1006, *30-31, (6th Cir 2007) ("Based upon the

evidence Tuttle presented during trial as to Anderson's inconsistent testimony and

statements regarding Tuttle's 2001 performance evaluation and her transfer to the

scale house booth, in addition to the age-related statements directed at Tuttle from

fellow Metro employees and other evidence of discrimination, we find that the jury

had sufficient evidence to find for Tuttle on the issue of pretext.").

Here, Kroger alleges that it immediately terminated Mr. Hardesty under a

zero tolerance "Customer 1st" Policy, despite that (as set forth above) there was no

evidence that he actually violated the policy. R. 51, PAGEID # 2260 (Schiff Dep.

Part II 113:1-21).

There are three pieces of record evidence showing a genuine issue of material fact regarding whether Mr. Hardesty's alleged conduct was sufficient to warrant termination.

First, Mr. Hardesty introduced evidence that a similarly-situated employee—Luvenia Orso—engaged in a comparable "Customer 1st" violation by filing to inform Mr. Hardesty of two new job requisitions, resulting in over 300 applicants sitting delinquently in Kroger's systems without ever receiving a screening call. R. 44-1 PAGEID # 1304-1305 (Hardesty Dec. ¶ 10-12). Certainly, if Mr. Hardesty's failure to take a single incoming call from an applicant is a "Customer 1st" issue warranting immediate termination, Ms. Orso's failure to inform a Recruiter of two new requisitions, resulting in over 300 applicants sitting delinquent, warrants the same treatment.

To be clear, Mr. Hardesty is not asserting that Ms. Orso should have been immediately terminated without warning for failing to inform him of the requisitions. But neither should Mr. Hardesty, who *was not just disciplined, but immediately terminated*, based upon nothing more than an unfounded accusation lodged against him for declining to take an incoming call. This difference in treatment, especially considering that Ms. Orso is a younger, African American woman, is evidence of pretext.

Second, Mr. Hardesty introduced evidence that by immediately terminating his employment Kroger failed to follow its own disciplinary policy. Plaintiff had no prior warnings or disciplinary action against him, and in fact had a good performance review the month prior to his termination. R. 25, PAGEID # 214 (Hardesty Dep. 38:11-39:16). Kroger's policy is clear that, in addressing a disciplinary problem, the first step will consist of a discussion between the Manager and associate, with possible probation recommended; if the problem continues, the second step is a written reprimand; and if the problem still continues, the third and final step is suspension or discharge. R. 28, PAGEID # 441 (Victoriano Dep. 41:2-13). Despite this clearly outlined policy, Mr. Hardesty received no probation, written reprimand, or suspension—Kroger went directly to termination. This failure to follow disciplinary policy is also evidence of pretext, especially considering that the policy was not uniformly applied. In particular, Ms. Williams and her team had provided multiple other employees with either warnings (written or verbal), or performance improvement plans, including Ms. Brittany Walker (a younger woman), Mr. Dominic Martin (a younger African American man), and Ms. Ellen Martin (a younger white woman). R. 31, PAGEID # 569-570, 644-646 (Williams Dep. 127:5-130:16; 422:18-423:23; 427:8-430:20)

Kroger argued, and the district court agreed, that this policy did not apply to Mr. Hardesty because his conduct was not a "routine problem." But the phrase

"routine problem" is not defined anywhere in Kroger's policy, nor is any policy set forth establishing that declining an inbound call is not a routine problem. At a minimum, this question of whether Mr. Hardesty's conduct was "routine" is a jury question.

Third and finally, the district court ignored or improperly discounted the evidence that the conduct of which Mr. Hardesty was accused was entirely unfounded. As set forth above, the sole evidence supporting the conduct was Ms. Whitlow's statement, which is inconsistent and directly contradicted by an eyewitness. This is not a situation where it has been established that the employee at issue actually committed the act, and the district court should have inferred from the circumstances—when viewing the evidence in the light most favorable to Mr. Hardesty—that such an unfounded accusation was insufficient to warrant immediate dismissal outside of Kroger's progressive disciplinary policy. *See Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir.2003) ("This court has held that the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation."). A jury should have decided the genuine issue of fact regarding whether the alleged conduct warranted immediate termination.

## CONCLUSION

For the reasons discussed above, the judgment below must be reversed, and

the case remanded for trial.

Respectfully submitted,

/s/ Joshua M. Smith
Peter A. Saba (0055535)
Joshua M. Smith (0092360)
Sharon J. Sobers (0030428)
Jeffrey M. Nye (0082246)
STAGNARO, SABA & PATTERSON CO., L.P.A.
2623 Erie Avenue
Cincinnati, Ohio 45208
(513) 533-6715
(513) 533-2716 (fax)
pas@sspfirm.com
**Attorneys for Plaintiffs**

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)(B)

In accordance with Rule 37(g) I certify that this brief complies with the type-volume requirements of Rule 32(a)(7)(b)(i). As determined by the word-count function of Microsoft Word, this brief contains 12,264 words.

/s/ Joshua M. Smith
Joshua M. Smith (0092360)

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and accurate copy of the foregoing was served electronically through the Court's electronic case filing system upon David K. Montgomery, Esq., and Ryan Martin, Esq., Jackson Lewis P.C., PNC Center, 26th Floor, 201 East Fifth Street, Cincinnati, Ohio 45202, this 12th day of June, 2018.

/s/ Joshua M. Smith
Joshua M. Smith (0092360)

## ADDENDUM #1

## DESIGNATION OF RELEVANT DOCUMENTS

| Docket Entry Number | Description | PAGEID# and Range |
|---|---|---|
| 1 | Plaintiff's Complaint | 1-10 |
| 14 | Plaintiff's First Amended Complaint | 50-59 |
| 25 | Deposition of Plaintiff Joseph Hardesty | 211, 214, 222 |
| 27 | Deposition of Robert "Buck" Moffett | 403 |
| 28 | Deposition of Diana Victoriano | 441, 443, 446-447 |
| 29 | Deposition of Briana Whitlow | 513-515, 517 |
| 30 | Deposition of Daniele Williams, Volume I | 529, 545, 565-567, 569-570, 577, 592, 595, 597-600, 602-603, 605-606 |
| 31 | Deposition of Daniele Williams, Volume II | 618, 623, 627, 644-646 |
| 32 | Defendants' Motion for Summary Judgment | 671-687 |
| 37 | Exhibits to Deposition of Briana Whitlow | 801 |
| 44-1 | Declaration of Plaintiff Joseph Hardesty | 1304-1305 |
| 45-1 | Recruiter position profile | 1309 |
| 45-9 | Hardesty email to Strosnider, Sept. 2, 2015 | 1356 |
| 45-10 | Joe Hardesty – Recap of Events | 1357-1358 |
| 45-11 | Whitlow email to Williams, Sept. 10, 2015 | 1359 |
| 47-1 | Kroger response to interrogatory no. 7 | 1393-1395 |
| 48 | Deposition of Chris Weiler | 1541-1542, 1559, 1572, 1601 |
| 49 | Deposition of Courtney Strosnider | 1734-1736, 1755-1756, 1791-1793, 1798 |
| 50 | Fed. R. Civ. P. 30(B)(6) Deposition of Rana Schiff on behalf of Kroger | 1888-1889 |
| 51 | Deposition of Rana Schiff | 2209-2212, 2260 |
| 57-5 | Disciplinary Action policy in employee handbook | 2867 |
| 57-12 | Williams email to Victoriano, Sept. 10, | 2878 |

| | 2015 | |
|---|---|---|
| 57-20 | Williams email, Sept. 15, 2015 | 2897-2899 |
| 67 | Order Granting Defendants' Motion for Summary Judgment | 3854-3876 |
| 69 | Plaintiff's Notice of Appeal | 4223 |
| 72 | Plaintiff's Motion for Extension of Time to File Appeal Pursuant to Fed. R. App. P. 4(a)(5) | 4227-4229 |
| N/A | Notation Order Granting Motion for Extension of Time, dated 5/3/2018 | N/A |